# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL DOCKET NO.  5:13CV87-RLV

STEPHEN WILKINSON,        )
       **Plaintiff,**       )
          )
  **v.**           )       **MEMORANDUM & ORDER**
          )
          )
**SUN LIFE AND HEALTH INSURANCE**  )
**COMPANY, dba SUN LIFE**    )
**FINANCIAL,**        
       **Defendant.**     )
_____ )

**THIS MATTER** is before the Court on Plaintiff Stephen Wilkinson's Motion for

Summary Judgment (Doc. 24), as well as Defendant Sun Life and Health Insurance Company's

Cross-Motion for Summary Judgment (Doc. 21), pursuant to Rule 56 of the Federal Rules of

Civil Procedure.  Prior to summary judgment, Plaintiff Wilkinson also filed a Motion to Dismiss

Defendant's Counterclaim (Doc.  16).[1]

## I. PROCEDURAL AND FACTUAL HISTORY

This matter arises out of a dispute over the payment of long term disability benefits under

29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").

Plaintiff is a former employee of Dolan & Traynor, Inc. ("D&T"), a closely held New Jersey

corporation.  The named Defendant Sun Life and Health Insurance Company ("Sun Life") is a

---

[1] The Court's summary judgment decision renders Plaintiff's Motion to Dismiss, which challenges the legal basis for Sun Life's ability to recover allegedly overpaid benefits, moot.

successor entity of GE Group Life Assurance Company, which issued the underlying employee benefit plan offered by D&T that gives rise to this dispute.[2]

The facts recited herein are taken from the pleadings and the documentary evidence presented in support of the parties' respective briefs.

### a. Wilkinson's Employment with Dolan & Traynor

In 1973, Plaintiff, Stephen Wilkinson ("Wilkinson"), began his employment with D&T, a wholesale marketing distributor of quality building products and plumbing specialties. Wilkinson was a D&T Vice President engaged in sales, operations, and distribution. While employed with D&T, Wilkinson's primary duties included management; sales and training activities (training instruction activities including lifting and carrying up to approximately 100 pounds); the use of power and hand tools at various facilities in the building / construction industry; 4-6 hours of driving; and air travel 3-4 times per year. Wilkinson worked approximately 60 hours per week and earned an annual salary of $434,300.00.[3] Wilkinson was also a stockholder (owning approximately 22%) of D&T, along with three others, Timothy Traynor ("Traynor"), B. Michael Dolan ("M. Dolan"), and Timothy Dolan ("T. Dolan"), who collectively owned the majority of D&T stock.

On August 18, 2003, Wilkinson's wife passed away. In the months following his wife's death, Wilkinson began to struggle emotionally and physically. Wilkinson eventually developed a heart condition known as cardiomyopathy, which also caused him to experience dyspnea and

---

[2] GE Group Life Assurance Company subsequently changed its name to Genworth Life and Health Insurance Company. (Doc. 22 at 6.) For simplicity's sake, the undersigned will refer to the insurer as Sun Life throughout this Memorandum and Order.

[3] $209,300 regular salary plus $225,000 bonus pay.

severe fatigue.[4]  As a result, Wilkinson's work productivity declined over a period of approximately seven months following the death of his wife – a fact conceded by Wilkinson.[5] These issues prompted Wilkinson and the other D&T shareholders to engage in discussions about Wilkinson's ability and willingness to continue in the same role and capacity on a sustained basis.

On March 19, 2004, D&T stockholders T. Dolan, M. Dolan, and Traynor, ("the Partners") called a meeting to discuss Wilkinson's performance in recent months.[6]  In a lengthy email to the Partners dated March 20, 2004, Wilkinson summarized the events of the meeting, beginning by stating that he was caught off guard and did not understand that his future with D&T was the sole reason for the meeting.[7] According to Wilkinson, he explained that he was "continuing to struggle with [his] physical and mental health."  According to Wilkinson, he took two weeks off after the passing of his wife, took a week off in October, as well as a few days around Thanksgiving and Christmas, and then took two weeks off for surgery.  Wilkinson represented the following:

---

[4]  Cardiomyopathy is a disease of the heart muscle that decreases the heart's ability to pump blood.  (Doc. 1, 7 n. 5).

[5]  The extent that Wilkinson's work declined, the specifics of his work schedule as of May 1, 2004 in particular, is the underlying factual dispute. Sun Life asserts that Wilkinson began his leave effective April 21, 2004.  Wilkinson contends that he did not begin his leave of absence, and did not work less than thirty hours a week prior to May 7, 2004.

[6]  The record reveals that Wilkinson and the other D&T stockholders referred to each other as "partners" despite the fact that D&T was not organized as a partnership but rather as a corporation. Because the D&T internal emails that describe the various meetings between Wilkinson, the Dolans and Traynor to discuss Wilkinson's prognosis and work expectations as "Partner Meetings," this Memorandum and Order will use the same term.

[7]  Wilkinson's email correspondence is described for purposes of context.  Wilkinson's email representations, which are not sworn to or affirmed, are solely from Wilkinson's perspective.  The undersigned notes, however, that Wilkinson's rendition of these events is not contradicted by the documentary record or sworn statements from D&T stockholders.

I would estimate in the last 7 months about 6 weeks of PTO (it may be more). My hours have typically been 9-5, some days less because of medical problems and doctor appointments. I have also spent time working from home when I have not been in the office, e-mail, voice mail, phone calls. I would estimate that my contributions over these months are about half what they were prior.

Wilkinson went on to state, "I would like to feel better and will continue to try to return to being more productive working no more than 40 hour weeks. This all depends on my ability." Reportedly, topics such as taking a FMLA leave of absence, reducing Wilkinson's compensation to take into account his current health condition and limitations, Wilkinson's insurability, and the possibility of adjusting Wilkinson's buy-out amount were all discussed but tabled for later discussion.[8]

The Partners called another meeting with Wilkinson on April 13, 2004. A follow-up email written to Wilkinson summarized the events of the meeting. The document also contained what appear to be Wilkinson's personal comments and responses to certain subjects. For example, Wilkinson wrote, "Based on our meeting of 3/19 and [my] recap, the partners feel [I] won't/can't be able to perform at a level acceptable to them . . . . My expressed desire to work 30-40 hours a week does not cut it with them." The Partners wanted Wilkinson to decide if he was "in or out." A third meeting was planned for the following week.

On April 21, 2004, Wilkinson and the partners met again to continue their discussion. (Doc. 22-2 at 30.) At this meeting, they discussed the possibility of Wilkinson taking a leave of absence again. Wilkinson agreed to take a leave of absence, but also wanted assurances that a written separation agreement would be prepared and executed in advance of his leave.

---

[8] Wilkinson wrote, "In a conversation about 2 months ago at lunch with [the Partners] I said maybe I should take a leave of absence," but noted that the D&T Partners were not immediately receptive to that idea because of questions an extended absence might raise from vendors.

On May 5, 2004, upon Wilkinson's request, D&T sent Wilkinson a document titled "Response to Employee Request for Family or Medical Leave and Employee Acknowledgements of Obligations" ("FMLA request")[9]. (Doc. 24-1 at 2.) The document stated in part, "In April of 2004, you notified us/we became aware of your need to take a family/medical leave due to a serious health condition that makes you unable to perform the essential functions of your job. . . We are aware that you need this leave beginning on or about May 10, 2004." (*Id.*)  The FMLA request form was signed by both Wilkinson and a representative from D&T's Human Resources Department.

Wilkinson's salary was paid by D&T until May 7, 2004. According to D&T records, Wilkinson's last day of work was May 7, 2004.

Wilkinson was on FMLA leave from May 7, 2004 through August 2004.

On July 14, 2004, Wilkinson advised D&T that he would be unable to return to work. (Doc. 22-1, 21 ¶ 9).

### b.  Wilkinson's Long Term Disability Benefits Paid by Sun Life

Immediately prior to Wilkinson's application for FMLA leave, D&T changed its provider for certain insurance products offered to its employees, including its provider for long term disability benefits.  Effective May 1, 2004, D&T offered and administered the "Dolan and Traynor, Inc., Employee Health and Welfare Benefit Plan," which provided disability benefits to employees pursuant to the terms of a group insurance policy issued by GE Group Life Assurance Company [now Sun Life].

---

[9] Sun Life argues that the FMLA form should not be considered by this court as discussed in Section III, *infra*.

In April 2004, prior to the effective date of the Sun Life group plan, Wilkinson completed an Enrollment Request form and selected to participate in Sun Life's Life Insurance / Accidental Death and Dismemberment (LI / AD&D) and Long Term Disability ("LTD") plans. (Doc. 22-3 at 57−58). Block 14 of Wilkinson's Enrollment Request Form indicated that "Hours worked weekly for this employer" (Excluding Overtime) reflected that Wilkinson was "Active" and working 40 hours. (Doc. 22-1 at 36) (AR0235).

On August 18, 2004, Wilkinson submitted a claim to Sun Life for payment of LTD benefits.[10] (AR0683, 1205−09). Wilkinson's claim under the Sun Life group insurance policy required D&T to confirm Wilkinson's employment status. In doing so, D&T represented in Block 4 of the "Employer Section" of the LTD application that Wilkinson's occupation was "Vice President" and that Wilkinson's "[w]ork schedule at [the] time of disability" was five days per week, eight hours per day. (Doc. 22-3 at 57). Similarly, D&T represented in Block 2 that Wilkinson's "[l]ast day worked" was 05/07/04 and answered "Yes" to indicate that on Wilkinson's last day worked (on May 7, 2004), he completed more than a half day. *Id.* Wilkinson's application was supported by an Attending Physician's Statement from Mark S. Rosenthal, M.D., dated August 13, 2004, characterizing Wilkinson's cardiomyopathy as "Class 2 (Slight Limitation)." Id. at 58. Dr. Rosenthal likewise represented that the "Date patient ceased work because of disability" was May 7, 2004. Id. Wilkinson began receiving disability benefits shortly after submitting his claim.

Wilkinson was subject to periodic reviews by Sun Life to confirm that he was still eligible for long term disability benefits. Sun Life required Wilkinson to undergo an

---

[10] Under the terms of the Policy, Wilkinson was not eligible to seek LTD benefits until after a ninety day elimination period. (Policy, Exclusions § I, 4).

Independent Medical Examination in January 2005 with Catalino De La Cruz, M.D., a specialist in cardiovascular disease, to evaluate for permanent disability. After investigation, based in part upon Dr. Cruz's opinion that Wilkinson was, in fact, permanently and totally disabled, Sun Life approved Wilkinson's claim on February 25, 2005. (Doc. 22-3, 51−56). In its approval letter, Sun Life explained that Wilkinson's cardiomyopathy was deemed a pre-existing condition. Because Wilkinson had LTD coverage since July 1, 2002 through D&T's previous group policy provider, Unum, immediately prior to the Sun Life policy's effective date, and met the other criteria for prior service credit, coverage was permitted despite the pre-existing condition.[11]

From August of 2004 until July of 2008, Sun Life paid Wilkinson monthly benefits without interruption. While receiving LTD benefits, Wilkinson was required to provide updated medical information and / or submit to functional capacity evaluations upon Sun Life's request. By all accounts, Wilkinson cooperated fully.

Under the terms of the Sun Life LTD policy, Wilkinson's premium payments were waived while receiving benefits under the Sun Life LTD policy.[12] (Doc. 22-3 at 10). The waiver of premiums ends on the date benefit payments cease.[13]

---

[11] The fact that Wilkinson's cardiomyopathy was characterized as a pre-existing condition, while not directly probative of Wilkinson's work schedule prior to May 1, 2004, demonstrates that Sun Life carefully scrutinized Wilkinson's original LTD claim.

[12] "Part 9: Waiver of Premiums" provided in pertinent part:

"We will continue your Long Term Disability Insurance without payment of premiums while you are Disabled and receiving benefit payments from us."

(Doc. 22-3, at 10).

[13] According to Wilkinson, Sun Life offered the same waiver of premium provision for its Life Insurance product and, in fact, waived payment of Wilkinson's premiums for his $200,000 life insurance policy while Wilkinson was receiving LTD benefits. Sun Life asserts that this claim is frivolous and correctly points out that the language in the LTD policy cited by Wilkinson doesn't even refer to life insurance. It seems that this aspect of Wilkinson's claim which, although affected by the LTD decision,

Wilkinson was eventually found "disabled" for purposes of the Social Security Administration Act, with an onset date of May 8, 2004, and has received social security disability benefits since that time.

### c. New Jersey State Court Litigation

On November 15, 2007, Wilkinson filed a state court action against D&T in the Superior Court of New Jersey, Chancery Division, General Equity, Passaic County. *See Wilkinson v. D&T, Inc., et al.*, Docket No.: C156-07. (Doc. 22-1, 43). Wilkinson brought suit against D&T, Traynor, M. Dolan, and T. Dolan by filing a Verified Complaint for Temporary Injunction and Other Relief. Wilkinson alleged that he was fraudulently induced to sign a modification of his on-death buyout agreement and resign as an officer of D&T. Wilkinson asserted that after he became disabled, the partners pressured him to resign from the company. The parties eventually settled the suit.

Sun Life did not question Wilkinson's eligibility for benefits until learning of the New Jersey lawsuit. Sun Life claims that information gathered from the lawsuit made Sun Life suspect that Wilkinson left D&T before Sun Life's policy went into effect. Sun Life bases this assertion largely on statements Wilkinson made in the state court pleadings. In the pleadings Wilkinson stated, "At the April 21st meeting, Timothy Dolan asked that I take a leave now . . . I agreed to take the leave of absence with Tim Traynor's agreement that, in a few weeks, they would have a written agreement prepared for me and that my health insurance would continue. . . Based on their promises to work out an agreement within a few weeks, I began a medical leave for an undetermined period of time, beginning on May 7, 2004." (Doc. 22-2 at 30.) Sun Life

---

may be premised upon a different insurance product offered by Sun Life and is not squarely before this court.

argues that Wilkinson's statement that Dolan asked him to take a leave "now" demonstrates, as a matter of law, that Wilkinson's leave *actually began on April 21, 2004* as opposed to May 7, 2004. (Doc. 22 at 10). Sun Life asserts that Wilkinson stopped working on April 21, 2004 and thus was not a full-time employee on May 1, 2004 when the policy began.

D&T consistently reported that Wilkinson's last day of work at the company was May 7, 2004. (Doc. 22-1 at 30.) In its Statement of Facts, produced in response to Wilkinson's lawsuit against the company, D&T wrote, "Wilkinson was an employee of D&T from approximately March 15, 1973 until May 7, 2004 … On May 8, 2004, Wilkinson finally took a medical leave of absence from D&T." (Doc. 22-2 at 1.) The company also noted that Wilkinson's performance level declined after his wife's death. (*Id.*) In a brief supporting D&T's position in the same lawsuit, D&T stated, "From August 18, 2003 until May 7, 2004, Wilkinson drastically reduced his attendance at work because of his medical problems and the emotional strain of his wife's passing." (*Id.*)  As previously noted, D&T represented on Wilkinson's application for LTD benefits that Wilkinson was full time.

### d.  Termination of Benefits by Sun Life

On July 29, 2008, after paying benefits to Wilkinson for four years, Sun Life sent Wilkinson a letter stating that he no longer qualified for long term disability benefits. (Doc. 22-2 at 39.)  Sun Life advanced two theories in support of its decision to discontinue Wilkinson's benefits. (*Id.*)

First, Sun Life claimed that there was insufficient medical evidence to show that Wilkinson was unable to perform the duties of his "regular occupation."[14] (*Id.* at 43.)  Sun Life

---

[14]  The July 29, 2008 denial letter (as well as the July 12, 2010 denial letter) from Sun Life explains in detail the portions of Wilkinson's medical record Sun Life contends supports its conclusion that Wilkinson was no longer qualified for long term disability benefits.  However, because Sun Life now

pointed to notes in Wilkinson's medical record made by Richard Scherczinger, M.D., in November 2007 and May 2008. Dr. Scherczinger opined in the Attending Physicians Statement that while symptoms of shortness of breath and fatigue continued, Wilkinson was probably able to perform "Light work." When asked specifically about Wilkinson's ability to return to work, Dr. Scherczinger responded, "cannot predict the future, light work probably ok, though patient's symptoms dictate." Dr. Scherczinger characterized Wilkinson's functional capacity rating as "Class 2 (Slight Limitation)." In a subsequent Attending Physicians Statement dated May 5, 2008, Dr. Scherczinger characterized Wilkinson's cardiac impairment as "Class 2 (Slight Limitation)."

Certain aspects of Sun Life's purported 2008 rationale were not, however, described within the July 29, 2008 denial letter but first recited in July 2010. In Sun Life's July 12, *2010* letter finally denying Wilkinson's administrative appeals, Sun Life supported the position *taken in 2008* by citing treatment notes from Dr. Rosenthal's records in the fall of *2005* and January of *2006* – submitted to Sun Life several years earlier in connection with a periodic review.[15]

---

concedes that Wilkinson was and is, in fact, totally disabled for purposes of the policy, the undersigned need not recite or evaluate all of the medical evidence.

[15] The two entries from Dr. Rosenthal's records cited by Sun Life in its July 12, 2010 denial letter read:

9/22/05
Patient is doing beautifully. He says he can walk about a half mile, before he fatigues. He has no PND or orthopnea . . .
Impression:
Cardiomyopathy, Class I CHF, very stable . . .

1/19/06
Patient is doing beautifully. No active cardiac symptoms . . . Echo done recently showed is EF is now up to 43% . . .
Impression:
Class I CHF, moderate cardiomyopathy . . ."

Another favorable April 2008 treatment note from Dr. Scherczinger was also included within the July 2010 denial letter.

Sun Life relied on these updated treatment notes from Dr. Rosenthal and Dr. Scherczinger to conclude that "Mr. Wilkinson's condition had improved with treatment since the time of the Independent Medical Examination." Sun Life also relied on a Functional Capacity Evaluation performed by Physical Therapist, Eduardo Regner, P.T., N.P.T. on July 16, 2008, finding Wilkinson capable of performing "Medium work."

As its second basis for discontinuing LTD benefits, Sun Life claimed that Wilkinson's lawsuit against D&T showed that he resigned from D&T not because of medical reasons, but because of disagreements with the partners over financial matters. In the July 29, 2008 letter Sun Life wrote, "It has come to light that it appears you are alleging you were forced to resign as an officer and employee of the company, not solely based on a disabling condition … rather a legal matter which has been addressed in the above mentioned court matter." (Doc. 22-2 at 43.) Sun Life advised Wilkinson he could appeal the decision if he disagreed with the company's findings. (*Id.* at 44.)

On August 18, 2008, following the denial of Wilkinson's LTD benefits, Sun Life also advised Wilkinson that he was no longer eligible for the waiver of premium benefit.

### e. Wilkinson's First Administrative Appeal

On January 23, 2009, counsel for Wilkinson wrote a six-page letter to Sun Life challenging the sudden discontinuation of Wilkinson's benefits and stated that the correspondence was intended to "serve as a request for an administrative review of Mr. Wilkinson's LTD claim." (Doc. 22-1, at 41.) Counsel raised several concerns with Sun Life's decision making process, questioning sun Life's failure to conduct an updated Independent

Medical Examination and Sun Life's reliance on a review of the medical record performed by MES Solutions, an entity that has historically provided medical reviews and examination solely on behalf of insurance carriers. Wilkinson took issue with Sun Life's decision to credit another reviewing physician's opinion (opining Wilkinson is not totally disabled) over the opinion of an examining physician (opining Wilkinson is totally disabled). Wilkinson demanded that Sun Life produce a copy of a Functional Capacity Evaluation dated July 16, 2008 not previously disclosed to Wilkinson, and also asked for additional time to supplement the record in several areas.

Wilkinson's appeal was assigned to Michelle Kelleher, a benefits consultant at Sun Life. Kelleher reviewed court documents from Wilkinson's New Jersey state court civil suit which stated that Mr. Wilkinson "worked on and off" at D&T and that Wilkinson's attendance at work had drastically declined. Kelleher also focused on Wilkinson's sworn statements which referenced the April 21st partner meeting, at which time Wilkinson initially agreed to take a leave of absence. Sun Life had some difficulty obtaining information from D&T. There is mention of at least one request made to D&T that went unanswered. It does not appear that Kelleher (or any Sun Life employee) sought information directly from the D&T stockholders or requested to conduct interviews.

On May 13, 2009, based on the entirely new theory that Wilkinson was not an "Active, Full-Time Employee" of D&T at the time of his application for long term disability benefits, Sun Life upheld the discontinuation of Wilkinson's benefits and demanded that Wilkinson reimburse Sun Life for all prior LTD payments. Sun Life's policy reads:

> "You are an Active Full-time Employee actively at work on any day if on that day you are:
> 1. working at your Employer's usual place of business or such place or places as the Employer's normal course of business may require; and
> 2. a United States citizen or resident working within the United States; and

3.  Performing all of the duties of your job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week unless otherwise stated in the INSURANCE SCHEDULE and
4.  Paid for such work in accordance with applicable Wage and Hour Laws and
5.  Not a seasonal or temporary employee.

(Doc 22-2 at 49.)  Sun Life later defines "Full-time Basis" as "a regular work schedule of at least 30 hours per week."[16] (*Id.* at 51.)  Given Sun Life's findings that benefits were correctly discontinued, albeit on different grounds, Sun Life did not make a determination as to Wilkinson's disability status under the Sun Life policy. Relying on a Reimbursement Agreement executed September 28, 2004 between Wilkinson and Sun Life, Sun Life sought repayment under § 502(a)(3) from Wilkinson for all benefits previously issued and allegedly overpaid in the amount of $386,539.37.  (Doc. 16, Exh. 2, ¶ 4).  Wilkinson challenged Sun Life's decision and appealed a second time.

### f.  Wilkinson's Second Administrative Appeal

On January 7, 2010, Wilkinson wrote an appeal letter to Sun Life in which he asserted he met the requirements of an "Active Full-Time Employee." (*Id.*) In his second appeal, Wilkinson noted that he did not have any incentive to claim a later disability date because had he filed for disability earlier, he would have been covered under a prior policy issued by Unum Insurance Company ("Unum"). Wilkinson noted that prior to May 1, 2004, D&T held a similar insurance agreement with Unum. Wilkinson argued that if he became disabled before Sun Life's policy began, he would have received the same amount in benefits from Unum. Wilkinson also alleged

---

[16]  The third criteria, whether Wilkinson was "[p]erforming all of the duties of [his] job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week" is determinative of the eligibility dispute.

that Sun Life's failure to investigate his eligibility at an earlier date prejudiced his ability to gather evidence.[17]

Wilkinson's second appeal was assigned to a different benefits consultant, Alan Carr. Sun Life's decision issued July 12, 2010. (Doc. 22-1 at 1−12). In connection with Wilkinson's second appeal, Sun Life required an updated Independent Medical Examination as suggested by Wilkinson's counsel in correspondence to Sun Life dated January 23, 2009. The Independent Medical Examination was performed by Dr. Lawrence Raymond and issued May 11, 2010. Dr. Raymond found that Wilkinson should be limited to "largely sedentary duties." (*Id.*) Dr. Raymond's objective medical findings contradicted the findings previously made by MES review of Wilkinson's medical record – relied on by Sun Life as the partial basis for discontinuing Wilkinson's LTD benefits in July 2008. Based on Dr. Raymond's medical opinion, Sun Life ultimately concluded that Wilkinson was unable to perform the obligations of his "regular occupation" and "totally disabled" under the Policy.[18]

Sun Life's inquiry did not end there. Sun Life's internal investigation turned to the circumstances surrounding Wilkinson's employment in the months leading up to his enrollment and application for LTD benefits. Sun Life contacted D&T to request records and documentation concerning the terms and conditions surrounding Wilkinson's employment.

---

[17] According to Wilkinson, either he does not have access to the records Sun Life requests (given his former role with D&T or due to the passage of time), or that any employment records that did exist are subject to a confidentiality agreement entered into by the parties in connection with their settlement of the New Jersey state court action.

[18] "Total Disability and Totally Disabled" mean "Total Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Totally Disabled if you are unable to perform all the material and substantial duties of your Regular Occupation."
    "Regular Occupation" is defined as "The occupation you are performing when your Period of Disability commences. This refers to your occupation as it is typically performed rather than the duties required by a specific employer or at a specific location."

Consistent with Wilkinson's representation about the lack of records, D&T confirmed that no attendance records were kept for company officers.  Sun Life next looked to the record of the New Jersey state court action.

Based on the statements Wilkinson made in his lawsuit against D&T, Carr concluded as fact that Wilkinson accepted the terms of his leave of absence *on April 21, 2004*.  Carr determined that at the time the Sun Life LTD plan went into effect on May 1, 2004, Wilkinson was not an "Active, Full-Time Employee" working 30 or more hours per week as defined by the Sun Life policy.[19]  Accordingly, Sun Life justified its original decision to discontinue long term disability payments with a new (its third) rationale − that Wilkinson was not an "Active, Full-Time Employee" at the time D&T's policy with Sun Life went into effect.  Sun Life's July 12, 2010 decision concluded the administrative appeal process and exhausted Wilkinson's administrative remedies.

### g.  Wilkinson's Federal Action in the Western District of North Carolina

On June 18, 2013, this civil action was commenced by the filing of Wilkinson's Complaint against Defendants Dolan & Traynor, Inc. Employee Health and Welfare Benefit Plan (the "Plan") and Sun Life seeking enforcement of rights under ERISA pursuant to 29 U.S.C. § 1132.  (Doc. 1).

On July 19, 2013, Sun Life filed its Answer and Counterclaim seeking equitable restitution from Wilkinson and repayment of $386,539.37 in benefits paid to Wilkinson pursuant to § 502(a)(3).  (Doc. 9).  Wilkinson filed his Answer to Sun Life's Counterclaim on August 9, 2013.  (Doc. 10).  In his First Defense, Wilkinson preserved his ability to challenge Sun Life's Counterclaim pursuant to Rule 12(b)(6).  (Doc. 10, 1).

---

[19]  Sun Life did not contest whether Wilkinson fell within the "Eligible Class" of employees able to receive LTD coverage.  Under the Policy, "each management employee" falls within the Eligible Class.

On November 4, 2013, Wilkinson voluntarily dismissed Defendant D&T Employee Health and Welfare Benefit Plan without prejudice. (Doc. 12). Sun Life is the sole remaining Defendant.

On July 25, 2014, Wilkinson filed a separate motion to dismiss Sun Life's Counterclaim pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, supported by a memorandum of law.[20] (Doc. 16).

On October 17, 2014, both Wilkinson and Sun Life moved for summary judgment on all issues and assert that no genuine issue of material fact exists.[21] (Docs. 21, 22, 24, 25). In his motion, Wilkinson requests an award of all benefits due and owing, an order that Sun Life pay him benefits until he reaches the age of 65 or is no longer disabled, and the reinstatement of his life insurance waiver of premium.[22] Sun Life's motion for summary judgment requests that the court uphold its discontinuation of benefits and order the repayment of benefits paid to Wilkinson prior to Sun Life's discovery of Wilkinson's ineligibility. (Doc. 21, 6.) Although Sun Life does not dispute that Wilkinson is totally disabled as defined in the plan, the parties disagree as to whether Wilkinson was an "Active Full-Time Employee" of D&T on May 1, 2004, the date D&T's policy with Sun Life began. (Doc. 22 at 6-7, Doc. 25. at 1.)

Federal subject matter jurisdiction is based upon ERISA, 29 U.S.C. § 1101, *et seq.*

---

[20] The local rules of this district permit a party to preserve an affirmative defense by identifying the defense in its initial responsive pleading. *See* WDNC L. Civ. R. 7.1(C)(1). A party must file a separate motion and supporting brief in order to have the matter decided by the Court. *Id*.

[21] Neither party requests a trial on any issue. In fact, Sun Life asserts as an affirmative defense that Wilkinson is not entitled to a jury trial. (Doc. 10, Affirmative Defenses, ¶ 3).

[22] D&T's policy with Sun Life includes a provision for waiver of premium payments for the LTD Policy in the event of disability under the plan. (Doc. 22-3 at 10.) Wilkinson claims that the same benefit is applicable to his life insurance policy.

## II. STANDARD OF REVIEW

### A.      Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). When considering cross-motions for summary judgment, the Court must review each motion separately on its own merits, "resolv[ing] all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *See Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (internal citation omitted); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (internal citations omitted).

### B.      ERISA

Under ERISA, judicial review of the plan administrator's decision is *de novo*. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629−30 (4th Cir. 2010) (citing *Champion v. Black & Decker Inc.*, 550 F.3d 353, 360 (4th Cir. 2008)). "When . . . an ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion." *Williams*, 609 F.3d at 629 (internal citations omitted).

In order to determine whether *de novo* review or the abuse of discretion standard applies, the Court considers whether the Policy provides discretionary authority to Sun Life.[23]

---

[23] Sun Life contends that the abuse of discretion standard applies.  Wilkinson contends that *de novo* review is appropriate.

In the Fourth Circuit, "no specific words or phrases are required to confer discretion, but [] a grant of discretionary authority must be clear." *Cosey v. Prudential Ins. Co. of America*, 735 F.3d 161, 165 (4th Cir. 2013) (quoting *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002)) (other internal citations and quotation marks omitted). Under Fourth Circuit precedent, *Cosey,* 735 F.3d at 165, the relevant language expressly and unambiguously provides broad discretionary authority:

**Claims Fiduciary**

GE Group Life Assurance Company [Sun Life] is a fiduciary, as that terms is used in ERISA and the regulations which interpret ERISA, with respect to insurance policies under which you, and if applicable, your dependents are Insured. In this capacity, we are charged with the obligation, and possess **discretionary authority** to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language.

GE Group Life Assurance Company [Sun Life], as Claims Fiduciary, shall have the **sole and exclusive discretion** and authority to carry out all actions involving claims procedures explained in this Policy. The Claims Fiduciary shall have the **sole and exclusive discretion** and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits. **All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and /or capricious manner**. . . . Whenever a decision on the claim is involved, the Claims Fiduciary is given **broad discretionary powers**.

(Doc 22-3 at 20) (emphases added). If properly considered part of the LTD Policy, this language unambiguously confers discretionary authority to the Claims Fiduciary – then GE Group Life Assurance Company [Sun Life].

In advocating for *de novo* review, Wilkinson contends that the language relied upon by Sun Life is not part of the Policy and is therefore not adequate or "legally sufficient" to convey discretion. *See generally, CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011). Sun Life argues that the grant of discretionary authority is found within a statement explaining ERISA rights that,

although not technically part of the Policy, was attached to and delivered with the Policy.[24]

According to Sun Life, because the Statement of ERISA Rights is not within a Summary Plan

Description, the cases cited by Wilkinson, including *Amara*, are inapposite. Sun Life's assertion

is supported by the fact that the Statement of ERISA Rights refers the beneficiary / insured to the

Summary Plan Description multiple times and distinguishes it from the document containing the

discretionary authority language.[25] These references tend to show that the Statement of ERISA

Rights and Summary Plan Description are separate, independent documents.

The question remains – whether the Statement of ERISA Rights, and its provision for

broad discretionary authority, is a valid mechanism for conferring discretionary authority to Sun

Life. In *Amara*, the Supreme Court considered whether the relief awarded by the district court

was authorized by § 502(a)(1)(B), which allows a plan participant to "recover benefits due . . .

under the terms of his plan," and the language of the ERISA plan. Answering the question in the

negative, the Supreme Court observed that the district court effectively looked to non-plan

documents to modify the terms of the plan. *Amara* explained, "we conclude that the summary

documents, important as they are, provide communication with beneficiaries *about* the plan, but

that their statements do not constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *Id.*,

at 1878. In this context, namely, a reformation of an ERISA plan, *Amara* held that the *terms* of

an ERISA plan could not be modified by way of summary plan documents. *Amara*, 131 S. Ct. at

1876−77; *see also L.B. ex rel. Brock v. United Behavioral Health, Inc., Wells Fargo & Co.*

---

[24] The page immediately prior to the discussion of the Claims Fiduciary includes the heading, "Your Rights Under ERISA." (Doc. 22-3 at 20).

[25] For example, under the subheading entitled, "Assistance with Your Questions," the document suggests that if the Insured has questions about the Plan, review of the Summary Plan Description will provide more information. In the next sentence, the document explains that if the Insured has questions about "this statement or about your rights under ERISA," it is appropriate to contact the nearest Office of the employee Benefits Security Administration, U.S. Department of Labor.

*Health Plan*, 47 F.Supp.3d 349, 355−57 (W.D.N.C. September 16, 2014) (construing *Amara* as allowing a Plan document to incorporate by reference a summary plan document; relying in part on concurrence of Justice Scalia which stated, "[a]n SPD is separate from a plan, and cannot amend a plan unless the plan so provides.").[26] *Amara* did not prohibit courts from considering multiple Plan documents, such as statutorily required summary documents consistent with the terms of the plan itself, in determining whether or not a Plan administrator or fiduciary was given discretionary authority for purposes of the standard of review. *See e.g., Pettaway v. Teachers Ins. and Annuity Ass'n of America*, (D.C. Cir. 2011) (holding as a matter of first impression that the court may examine multiple Plan documents, including statutorily required ERISA summary documents such as summary plan descriptions, in determining the appropriate standard of review). For this reason, the undersigned finds that the provision of discretionary authority set forth within the Statement of ERISA Rights attachment to the Sun Life LTD Policy is properly considered in determining the appropriate standard of review.

Because the Plan grants Sun Life discretionary authority, judicial review is for an abuse of discretion. "Under the abuse-of-discretion standard, [the court] will not disturb a plan administrator's decision if the decision is reasonable, even if [the court] would have come to a contrary conclusion independently. *Id*. Thus, we may not substitute our own judgment in place of the judgment of the plan administrator. *See Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1008

---

[26] The *Brock* decision summarized *Amara* as follows: "At its core, *Amara* stands for the proposition that ERISA requires courts to enforce the language of the plan, not the language of plan summaries." (citing *Amara*, 131 S.Ct. at 1876−77). The Supreme Court explained that the role of summary plan documents is to "provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute[] the terms of the plan . . . ." *Brock*, (quoting *Amara*, 131 S.Ct. at 1878) (emphasis in original); *see also Strickland v. AT&T Umbrella Ben. Plan No. 1*, 2012 WL 4511367 (W.D.N.C. October 1, 2012). "Terms in a summary plan document that *conflict* with the plan itself are not enforceable." *Id*. (citing *Amara*, 131 S.Ct. at 1876−77).

(4th Cir. 1985). To be held reasonable, the administrator's decision must result from a "deliberate, principled reasoning process" and be supported by substantial evidence. *Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long Term Disability Plan*, 509 F.3d 644, 651 (4th Cir.2007); *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997).

In *Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), we identified eight nonexclusive factors, including a conflict of interest, that a court may consider when evaluating for reasonableness,:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id*. at 342–43 (footnote omitted); *see also Champion v. Black & Decker*, 550 F.3d 353, 357−359 (4th Cir. 2009) (explaining how the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn* altered judicial review in ERISA cases).

With respect to any conflict of interest, the Fourth Circuit clarified the following in *Champion*:

> [T]he *Glenn* Court held that when the plan administrator serves in the dual role of evaluating claims for benefits and paying the claims, the dual role itself creates a conflict of interest. 128 S.Ct. at 2346, 2348. The Court found in the case before it that because an insurance company served as both administrator and insurer of the plan—as administrator it had discretionary authority to determine claims and as insurer it paid the claims—the insurance company had a conflict of interest. *Id*. at 2346. But it also noted that the same conflict is created when an employer serves in a similarly dual role. *Id*. at 2348.
>
> The Court held, however, that the presence of a conflict of interest did not change the standard of review from the deferential review, normally applied in the review of discretionary decisions, to a *de novo* review, or some other hybrid

standard. 128 S.Ct. at 2350. Indeed the Court stated that the conflict of interest should not otherwise lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id*. at 2351. Rather, it held that when reviewing an ERISA plan administrator's discretionary determination, a court must review the determination for abuse of discretion and, in doing so, take the conflict of interest into account only as "one factor among many" that is relevant in deciding whether the administrator abused its discretion. *Id*. The process that the Court envisioned is similar to that followed by courts generally in applying any multiple-factor test to review for reasonableness. As the Court said:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.

> As it now stands after *Glenn*, a conflict of interest is readily determinable by the dual role of an administrator or other fiduciary, and courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by that administrator, even if the administrator operated under a conflict of interest. Under that familiar standard, a discretionary determination will be upheld if reasonable. *See Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long–Term Disability Plan*, 509 F.3d 644, 650 (4th Cir.2007). And any conflict of interest is considered as one factor, among many, in determining the reasonableness of the discretionary determination.
>                                        ***
> Accordingly, we review the Plan's determination in this case for abuse of discretion, taking into account any conflict of interest as one of the factors considered in determining reasonableness.

550 F.3d 353, 357−359 (4th Cir. 2009); *see also Williams*, 609 F.3d at 631 (internal citation

omitted).

### C.     Treatment of Cross-Motions for Summary Judgment

Having set out the appropriate analytical framework, we next address the court's

treatment of the parties' cross motions for summary judgment.   According to Wright &

Miller, competing cross motions for summary judgment are:

no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*McGhee v. Aetna Life Ins. Co.*, 63 F.Supp. 3d 572, 579 (W.D.N.C. October 29, 2014) (quoting Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720.)[27] "In reviewing the arguments of the parties, the court has treated the motions and the citations of evidence in the administrative record in the manner it would a bench trial by first considering the evidence contained in the administrative record which Plaintiff has cited in his favor and then considering the record evidence by Defendant." *See e.g.*, *McGhee*, 63 F.Supp.3d at 579 (citing *Stewart v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 2012 WL 122362 (D. Md. 2012)).

### III. ADMISSIBILITY OF FMLA FORM

A threshold issue is whether the FMLA document produced by D&T, dated May 5, 2004, can be considered by this court. Sun Life argues that the FMLA document should not be considered because it was not part of the administrative record. Sun Life asserts that neither D&T nor Wilkinson provided the form during Wilkinson's eligibility hearings. Wilkinson argues that the form is admissible because Sun Life was aware Wilkinson was placed on FMLA leave at the time it denied his benefits. In Sun Life's letter denying benefits to Wilkinson, the company states, "Mr. Wilkinson … assert[s] that his leave of absence commenced May 7, 2004, under

---

[27] Sun Life cites cases from other circuits for the proposition that in ERISA cases, "summary judgment is simply a vehicle for deciding the [benefits] issue and the non-moving party is not entitled to the usual inferences in its favor." *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 82−83 (1st Cir. 2010); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

unpaid FMLA.'" (Doc 22-1 at 24.) Wilkinson argues that this statement demonstrates Sun Life's knowledge of the existence of the FMLA form.[28]

When the appropriate standard of review is abuse of discretion, evidence outside of the record is generally not admissible. *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). However in *Helton v. AT&T Inc.*, the Fourth Circuit noted that in ERISA cases, courts should take "a more nuanced approach to consideration of extrinsic evidence on deferential review, rather than embracing an absolute bar." 709 F.3d 343, 352. Thus, the *Helton* panel held that, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the *Booth* factors *and the evidence was known to the plan administrator when it rendered its benefits determination*." *Id.* at 356 (emphasis added). The court emphasized that the most critical determination was whether or not the evidence was known to the administrator at the time it rendered its decision. *Id.* The court explained, "[I]n discussing what evidence may be considered, we generally have focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the administrative record." *Id.* Basing the admissibility of the evidence on whether it was known to the administrator prevents the administrator from unfairly picking and choosing only evidence which is most favorable to its position. *Id.* at 353. "The fact that [a plan administrator] did not bother to read pertinent evidence actually before him cannot shield [the plan's] decision from review." *Id.* (quoting *Hess v. Hartford Life Acc. Ins. Co.*, 274 F.3d 456, 462−63 (7th Cir. 2001)).

---

[28] Wilkinson further suggests that Sun Life's failure to include the form in the administrative record demonstrates the company's conscious disregard of evidence that he was a full time employee of D&T until May 7, 2004.

Under *Helton,* the admissibility of the FMLA form in this case turns on whether or not Sun Life was aware of the form at the time it rendered its decision to deny Wilkinson benefits. Although Sun Life argues that it did not administer claims under the employer's FMLA program, and would not necessarily have FMLA related documents in its possession, there is record evidence that Sun Life was aware of Wilkinson's FMLA leave and had at least constructive notice of the FMLA paperwork.  In Sun Life's denial letter dated May 13, 2009, Sun Life references claims made by Wilkinson that he took FMLA leave in May. Sun Life writes, "In a letter dated October 6, 2004, Mr. Wilkinson wrote, '…At the time I went on FMLA leave from work in May for medical reasons.'" Sun Life also notes, "Mr. Wilkinson goes on to assert that his leave of absence commenced on May 7, 2004 under unpaid FMLA." These statements demonstrate that Sun Life was aware that Wilkinson took FMLA leave and it knew or should have known of the forms documenting this leave as the relevance of such forms would have been obvious and the need to inspect them compelling, especially in view of their proximity in time to the determinate dates at issue.

The admissibility of the FMLA form also informs this court's evaluation of the *Booth* factors, especially the third and eighth factors. The third factor instructs the court to evaluate, "the adequacy of the materials considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342-43. Here, the record compiled by Sun Life, although not necessarily inadequate, does not include a document highly probative of the disputed issue, namely, the FMLA form. The FMLA request memorializes the fact that April 21, 2004 marked the date that Wilkinson *made D&T aware* (gave D&T notice) *of his intention* to request medical leave under FMLA.

The FMLA form also speaks to the eighth *Booth* factor, "the fiduciary's motives and any conflict of interest it may have." Although the Supreme Court has held that courts may not change the applicable standard of review because of the conflict of interest insurers may face in benefits decisions, the conflict of interest in an ERISA case may be considered in evaluating the reasonableness and fairness of the inclusion of evidence in the record. *Glenn*, 554 U.S. at 357−59. Whether Sun Life ever had actual possession of the FMLA form, or whether Sun Life acted purposefully or with an improper motive in not ensuring that the FMLA form became a part of the administrative record concerning long term disability is less than transparent. However, including the form in this court's evaluation promotes a reasoned and fair evaluation of the claims so it will be considered.

## IV. DISCUSSION

Plaintiff brings this action for long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B) of ERISA, which states that a person may bring a civil suit, "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Plaintiff argues that Sun Life wrongly terminated his disability benefits and seeks the award of all retroactive benefits due and owing. Thus, the Court must determine whether, as of May 1, 2004, Wilkinson was "performing all of the duties of [his] job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week." This factual question is determinative as to Wilkinson's eligibility for LTD benefits under Sun Life's Policy.

According to Sun Life, Wilkinson bears the burden of establishing that he was eligible for LTD benefits under the Policy. (Doc. 27 at 14) ("It is Plaintiff's burden to prove that his

claim falls within the Plan's scope of coverage.")  *See Jenkins v. Montgomery Indus.*, 77 F.3d

740, 743 (4th Cir. 1996).  *Jenkins* reads:

> "A basic rule of insurance law provides that the insured must prove that a
> covered loss has occurred, while the insurer carries the burden of demonstrating
> that a loss falls within an exclusionary clause of the policy."

*Jenkins*, 77 F.3d at 743 (internal citations omitted); *Donnell v. Metro Life Ins. Co.*, 165 Fed.

Appx. 288, 296 (4th Cir. 2006). In the Court's view, Wilkinson satisfied his burden of showing

that "a covered loss" occurred.

"ERISA represents a careful balancing between ensuring fair and prompt enforcement of

rights under a plan and the encouragement of the creation of such plans."

*Conkright v. Frommert*, 559 U.S. 506, 516−17 (2010) (internal quotation marks and citations

omitted).  Significantly, "ERISA imposes higher-than-marketplace quality standards on insurers.

It sets forth a special standard of care upon a plan administrator, namely, that the administrator

"discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the

participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the

particular importance of accurate claims processing by insisting that administrators "provide a

'full and fair review' of claim denials."  *Glenn*, 554 U.S. at 115 (citing *Firestone*, 489 U.S. at

113 (quoting § 1133(2)).

"In a summary judgment motion, "the arbitrary and capricious [abuse of discretion]

standard requires that [the court] ask whether the aggregate evidence, viewed in the light most

favorable to the non-moving party, could support a rational determination that the plan

administrator acted arbitrarily in denying the claim for benefits.""[29]  *Williams v. Delta Family-Care Disability and Survivorship Plan*, 2009 WL 57138, * 6 (E.D.N.Y.  January 7, 2009).

For the following reasons, Plaintiff's motion for summary judgment is <u>granted</u> and Defendant's motion is <u>denied</u>.

### A.    Sun Life Abused its Discretion in Discontinuing Wilkinson's Benefits

Under the abuse of discretion standard, Sun Life's decision should not be disturbed if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F. 3d 860, 869 (4th Cir. 2011); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629−30 (4th Cir. 2010). In assessing whether Sun Life made a reasonable decision, this court is guided by the *Booth* factors.  The third and fifth *Booth* factors are the most relevant.[30]

### 1.  The Plan Administrator's Action was Not Supported by Substantial Evidence

Sun Life's final decision to discontinue Wilkinson's benefits on the theory that Wilkinson was working less than 30 hours per week in the weeks leading up to the onset of his disability is not supported by substantial evidence.  Simply put, the evidence relied upon by Sun Life to show that Wilkinson was not an "Active, Full-Time Employee" does not adequately support Sun Life's decision to terminate benefits.  In deciding to revoke Wilkinson's benefits, Sun Life relied

---

[29] In application, courts have "grappled with the relationship between the standard of review at the summary judgment stage and the ["arbitrary and capricious"] standard in ERISA cases." *Williams*, 2009 WL 57138, * 6 n. 5.  "However, the fact that the parties have brought cross-motions for summary judgment in this case "cannot be permitted either to dilute the teachings of *Firestone* or to undercut the standard of review that the *Firestone* Court decreed for use in ERISA benefit denial cases." *Id*.  This respectful standard requires deference to the findings of the plan administrator, and, thus, even under Fed.R.Civ.P. 56, does not permit a district court independently to weigh the proof." *Id*. (internal citations omitted).

[30] The third *Booth* factor instructs the court to assess both the adequacy of the materials used to make the plan administrator's decision and the degree to which they support it. *Booth*, 201 F.3d at 342−43. Under the fifth factor, the court asks whether the decision making process was reasoned and principled. *Id*.

largely on the statements Wilkinson made in his lawsuit against D&T. Sun Life claims these statements show that Wilkinson *admitted* he took a leave of absence from the company beginning on April 21, 2004. However, Sun Life focuses only on a few lines from Wilkinson's sworn statements and ignores the equally important information that follows. Sun Life cites Wilkinson's statements that, "[a]t the April 21st meeting Timothy Dolan asked that [he] take a leave now" and that Wilkinson "agreed to take the leave of absence" as evidence that Wilkinson began his leave of absence immediately following that conversation on April 21, 2004.[31] Throughout Wilkinson's administrative appeal process, Sun Life failed to recognize that in that same paragraph of his certified statement, Wilkinson went on to say, "Based on [the partners] promises to work out an agreement within a few weeks, I began a medical leave for an undetermined period of time, beginning on May 7, 2004." Therefore, Sun Life's assertion that *by Wilkinson's own admission* he ceased working on April 21, 2004 is without merit – a misrepresentation at most and an obfuscation at least. A review of the record in its entirety reveals that Wilkinson and his fellow D&T stockholders discussed Wilkinson's work performance and the possibility of him taking a leave of absence on at least three different occasions. The May 5, 2004 FMLA request was made at Wilkinson's behest and the only trigger for action.

Sun Life additionally argues that Wilkinson began working less than 30 hours per week before its policy with D&T went into effect. In its July 12, 2010 denial letter, Sun Life suggests that Wilkinson may have become "Partially Disabled" before the Group Account effective date

---

[31] Wilkinson never admitted that he began his leave of absence on April 21, 2004. Rather, Wilkinson admitted that once the suggestion was made, he agreed to take the necessary steps to pursue FMLA leave in the immediate future. There is no evidence, documentary or otherwise, establishing that *the discussion that occurred on April 21, 2004* can be equated with a decision that Wilkinson took leave (was no longer an "Active, Full-Time Employee") effective April 21, 2004.

of May 1, 2004, and, therefore, ineligible for LTD benefits under the Sun Life Policy on that basis as well. (Doc. 22-1, at 11). If factually correct, the earlier "Period of Disability," starting before the May 1, 2004 effective date, would be precluded under the Sun Life Policy. Again, Sun Life's proffer is based solely on assertions made by D&T in Wilkinson's state court lawsuit that did not involve the timing of Wilkinson' medical leave and disability. The company stated that, "from August 18, 2003 until May 7, 2004, Wilkinson drastically reduced his attendance at work because of his medical problems." Sun Life interpreted these statements to mean that Wilkinson worked less than 30 hours per week in the weeks leading up to the onset of his disability. Wilkinson asserts D&T's statements reflect that while he was working 60 hours per week before his wife's death, he began working 30-40 hours per week as his health declined. In Wilkinson's sworn declaration, he points out that "If I was in fact medically disabled, as Sun Life now contends, prior to May 7, 2004, it would have been financially beneficial for me to have applied for waiver of premium and Social Security disability utilizing an earlier date." (Doc. 22-1 at 21, ¶ 14). Because there are no attendance records available for officers of D&T, there is no direct evidence beyond Wilkinson's declaration to prove how many hours Wilkinson worked in the weeks leading up to his disability. The only concrete information obtained from D&T personnel was that Wilkinson had twenty five days of Personal Time Off (PTO) that he did not request or use in the time period immediately prior to his commencement of FMLA leave. Therefore, claims made by Sun Life that Wilkinson worked less than 30 hours a week are mere speculation and contrary to the substantial evidence of record.[32]

---

[32] Sun Life also rejects the May 7, 2004 date as Wilkinson's last day of full-time employment found throughout D&T's records. Sun Life contends that D&T's statements are not binding on the Court because Sun Life – not D&T – is the fiduciary and the entity charged with determining whether Wilkinson was eligible and entitled to LTD benefits under the Policy. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 275−76 (4th Cir. 2002). D&T's records are probative, though not binding.

In *Bowers v. Life Ins. Co. of N. America*, summary judgment was granted in favor of the plaintiff-employee beneficiary receiving LTD benefits where the waiver of premium benefit for a life insurance policy was denied based upon a similar theory.  21 F.Supp.3d 993 (D. Minn. May 14, 2014) (conducting a *de novo* review of the denial of benefits).  Like the instant case, *Bowers* dealt with an eligibility question that hinged on the work schedule and employee status of its Insured, Bowers − the same type of factual dispute this Court is faced with deciding although in a slightly different posture.[33]  *Id.* at 997−999.  As relevant here, under the Plan, Bowers's eligibility for the waiver of premium (or "WOP") benefit turned on whether Bowers left employment as a full-time employee "regularly working a minimum of 30 hours a week."  *Id.* at 1002.   In support, Bowers presented documentary evidence that his employer paid him and characterized him as a full time employee up until the time he left due to disability.  *Id.* at 997−999, 1002. Bowers supplied a personal affidavit as well as an affidavit from his former supervisor speaking to his regular work schedule and average number of hours worked after returning to employment following surgery.[34]  *Id.*  However, Bowers, a salaried employee, was unable to produce timesheets in support of his claim that he worked at least thirty hours a week. *Id.*  Bowers's employer, C. H. Robinson, confirmed that no timesheets or other specific documents existed to confirm or refute Bowers's claim.  *Id.*  The district court was of the view that the evidence submitted by the defendant was not specific in any regard and did not

---

[33]  *Bowers* is more complicated than what is discussed here. The *Bowers* court dealt with denial of a waiver of premium issue in connection with a life insurance policy that awarded the waiver of premium benefit to employees "regularly working a minimum of 30 hours per week" that were deemed "disabled" under standards prescribed by the underlying employee benefit plan.  For purposes of informing this Court's review of the pivotal factual question of Wilkinson's work schedule during the relevant time period, the Court only recites the facts in *Bowers* pertinent to this inquiry.

[34]  Bowers returned after surgery with the understanding that he would initially work 25 hours a week and gradually increase his weekly hours to full-time.

contradict the evidence presented by plaintiff. *Id*. at 1003. In his sworn affidavit, Bowers stated that while he worked 25 hours per week upon returning after surgery, he increased his workload to 34.5 hours per week after the first "couple of months," and continued to work full time until he left in June 2009. *Id*. at 1002. The district court found Bowers's affidavit valuable (probative) because it was *based on personal knowledge*. *Id*. at 1003−04. The court observed, "arguably, no one knew Bowers's work schedule better than he." *Id*. at 1003. Nonetheless, the district court did not treat the Bowers's affidavit as determinative; rather the Bowers's affidavit was considered along with the other record evidence. *Id*. at 1002−04. The court found that "[t]he only evidence documented in the record specifically addressing Bowers's work schedule demonstrate[d] Bowers regularly worked at least 30 hours per week."[35] *Id*. at 1002.

Like the Insurer in the *Bowers* case, Sun Life criticizes Wilkinson for failing to offer conclusive *proof* as to the number of hours he worked at D&T in April and May of 2004. However, the circumstantial evidence of record is persuasive and consistently identifies May 7, 2004 as the last day Wilkinson was an active and full-time employee of D&T. (*See* Plaintiff's Mem. In Supp., 11−14). Wilkinson produced emails between himself and the partners of D&T showing that in a meeting on March 19, 2004, Wilkinson told the partners he felt it would be best for him to work no more than 40 hours a week. In an email recapping a subsequent meeting held on April 13th, Wilkinson wrote, "My expressed desire to work 30-40 hours a week does not cut it with [the partners]." This statement, written long before Wilkinson could have anticipated Sun Life's denial of benefits, shows that Wilkinson suggested cutting back on his hours but was not permitted to do so. Additionally, even if Wilkinson had begun to work 30-40 hours per week

---

[35] The court correctly limited judicial review to the same record before the fiduciary and plan administrator.

prior to May 1, 2004, as he requested, he would still have been considered a full time employee under the language of Sun Life's policy.

Plaintiff's most compelling evidence that he was a full-time employee on the date Sun Life's policy went into effect is the FMLA request produced by D&T's Human Resource Department on May 5, 2004. On that form, D&T states that the company is aware Plaintiff would begin FMLA leave "on or about May 10, 2004." This is consistent with Plaintiff's claims that he began his leave on May 7, 2004. If Plaintiff had taken leave on April 21, 2004 as Sun Life claims, there would be no need for D&T representatives to have produced and signed this form on May 5, 2004. The FMLA request further states: "In April of 2004, you notified us/we became aware of your need to take family/medical leave." Thus, the FMLA request corroborates Wilkinson's representation that a decision concerning taking medical leave was made on April 21, 2004, as opposed to April 21, 2004 marking the commencement of Wilkinson's FMLA leave period.[36]

Additionally, statements made by D&T before, during, and after Wilkinson's lawsuit against his former employer support the assertion that Wilkinson's last day of work was May 7, 2004. In statements made during Wilkinson's lawsuit against the company, D&T stated that Wilkinson was an employee, "from approximately March 15, 1973 until May 7, 2004" and "on May 8, 2004, Wilkinson … took a medical leave of absence." D&T made these statements while

---

[36] Sun Life fails to reconcile the FMLA form with its contrary finding and conclusion. Sun Life maintains that Wilkinson left D&T on April 21, 2004, but does not attempt to explain why the FMLA form, dated May 5, 2004, states he left "on or about May 10, 2004." Sun Life also suggests that the May 7, 2004 date is not factually correct (appeared out of thin air) because the FMLA form is dated two days earlier. Sun Life also implies that D&T's company records and representations are not sufficiently reliable or conclusive on the matter because D&T is not the fiduciary – Sun Life is the fiduciary. Again, Sun Life cannot explain why *every other pertinent document in the record* reflects the same May 7, 2004 date.

being sued by Wilkinson. Therefore, it is highly unlikely that the company would have any motivation to falsify the date on which he left the company. D&T also paid Wilkinson's salary until May 7, 2004, when the company noted he was put on unpaid FMLA leave. The fact that Wilkinson continued to be paid his full salary by D&T until May 7th supports the conclusion that he was a full-time employee up until that date.[37] Here, a finding that Wilkinson worked as an "Active, Full-Time Employee" until May 7, 2004 when he began a leave of absence is supported by the substantial evidence presented. Sun Life's attempt to dissect each portion of the record and argue why no single document in the record *proves* that Wilkinson was working at least thirty hours a week up until May 7, 2004, is not persuasive. In light of the administrative record that tends to show that all actors (including D&T and Sun Life) considered Wilkinson an "Active, Full-Time Employee" until he began his FMLA leave, a rational fact finder could not reasonably determine that Wilkinson worked less than thirty hours a week and was, therefore, ineligible all along for Sun Life LTD benefits.

### 2. Sun Life's Decision Making Process Was Not Reasoned and Principled

Sun Life's decision making process gives this Court pause for several reasons. As an initial matter, Sun Life concedes that its close scrutiny of Wilkinson's LTD claim some four years after awarding benefits was initially prompted by Wilkinson's state court lawsuit against D&T rather than discovery of objective medical evidence gathered through periodic review. Although Sun Life denies any improper motive, a comparison of the denial letters written by Sun Life reveals that Sun Life's final and comprehensive July 12, 2010 denial letter is designed in

---

[37] Sun Life points out that D&T's payment of Wilkinson's salary through May 7, 2004 does not necessarily mean Wilkinson satisfied the terms of the Policy and was eligible for LTD benefits. D&T's payment of Wilkinson's salary, like the other circumstances, is one piece of information that informs the Court's substantial evidence review.

part to bolster Sun Life's previous (and subsequently abandoned) position regarding total disability with post-hoc rationale.

In addition, Sun Life advanced multiple arguments in its effort to justify the discontinuation of Wilkinson's LTD benefits. Sun Life first advised Wilkinson he would be ineligible for benefits on July 29, 2008. On that date, Sun Life claimed the decision was made because there was insufficient medical evidence to show that Wilkinson was unable to perform the duties of his job.[38] Sun Life also claimed that Wilkinson did not leave D&T for medical reasons, but because of disagreements with the partners. It was only after Wilkinson filed an appeal refuting these allegations that Sun Life first accused him of reducing his work hours to less than 30 hours per week.[39] The fact that Sun Life concluded Wilkinson was not a full time employee only after unsuccessfully claiming Wilkinson was ineligible for benefits for two other reasons supports Wilkinson's contention that Sun Life's decision making process was unreasonable. In short, Sun Life's persistence in denying Wilkinson benefits on the basis of three different theories suggests Sun Life's decision was driven by a desired outcome.

Moreover, Sun Life did not conduct its investigation of Wilkinson's disability date in a reasoned and principled manner. Sun Life argues that it conducted a thorough investigation and gave Wilkinson every opportunity to submit evidence he was eligible for coverage. Sun Life did not engage in a searching or "leave no stone unturned" investigation. Sun Life apparently did

---

[38] This basis for denial was later dropped after Wilkinson was examined by an Independent Medical Examiner who concluded that Wilkinson was unable to perform the duties of his job.

[39] Sun Life argues that it did not "switch" the bases for which it denied Wilkinson his benefits because in the first denial letter the company stated both medical reasons and the D&T lawsuit as reasons for discontinuing Wilkinson's benefits. However, in the first denial letter Sun Life only claims Wilkinson's resignation was unrelated to his medical disability; the company does not accuse him of working less than full time. Although both Sun Life's second and third bases for denial relate loosely to evidence procured from Wilkinson's lawsuit against D&T, they are separate theories.

not seek out information from D&T principals to clarify any questions it had concerning Wilkinson's work schedule leading up to May 1, 2004. Sun Life also fails to take into consideration the reality that Wilkinson's effort to produce concrete evidence of his day-to-day activities at work *five to ten years ago* was frustrated by the passage of time. Notwithstanding the absence of records documenting Wilkinson's daily work activities, it is undisputed that Wilkinson cooperated with Sun Life to prove his eligibility for LTD benefits. Wilkinson submitted evidence to Sun Life including copies of emails between himself and the partners at D&T and sworn statements he made in his prior lawsuit. Wilkinson also reported and established that he declared May 7, 2004 as his date of disability on other corroborating documents including Social Security Documents and his life insurance policy documents.[40] Most importantly, Wilkinson requested and voluntarily submitted himself to a second updated Independent Medical Examination in which it was eventually confirmed that he was totally disabled. In conclusion, the Court finds that Sun Life's investigation falls short of ERISA's "higher-than-marketplace quality standards." *See Glenn*, 554 U.S. at 115.

## V. CONCLUSION

For the reasons discussed above, the Court concludes that Plaintiff Stephen Wilkinson is entitled to the requested relief consistent with the terms of this Memorandum and Order, namely, all benefits of an Insured enjoying coverage under the terms of the Sun Life LTD Policy, including reinstatement of Wilkinson's LTD benefits and LTD waiver of premium.

---

[40] The court is not persuaded that Wilkinson falsified the information contained on these documents for the purpose of defrauding Sun Life.

## VI. ORDER

**IT IS, THEREFORE**, **ORDERED** that Plaintiff's Motion for Summary Judgment is hereby **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**. Plaintiff's Motion to Dismiss Sun Life's Counterclaim is likewise **GRANTED** and said Counterclaim is hereby **DISMISSED WITH PREJUDICE**.


Signed: September 1, 2015


Richard L. Voorhees
United States District Judge